UNITED STATES DISTRICT COURT
<u>WESTERN DISTRICT OF NEW YORK</u>

UNITED STATES OF AMERICA,

                        Plaintiff,

v.

LUIS MONTANEZ,

                        Defendant.

Case # 15-CR-122-FPG

DECISION AND ORDER

## INTRODUCTION

On May 14, 2020, Defendant Luis Montanez filed a Renewed Motion to Reduce Sentence. ECF No. 182. Defendant requests that the Court either reduce his sentence to time served or modify his sentence to be carried out in home confinement because of the ongoing Coronavirus Disease 2019 ("COVID-19") pandemic. *Id.* The Government opposes the Motion. ECF No. 186. For the reasons that follow, Defendant's Motion is DENIED.

## BACKGROUND

On October 2, 2017, Defendant pleaded guilty to one count of conspiracy to possess with intent to distribute, and distribution of, 100 grams or more of heroin in violation of 21 U.S.C. § 846, a charge that carries a mandatory minimum term of imprisonment of five years and a maximum term of forty years. ECF Nos. 105, 106, 108; 21 U.S.C. § 841(b)(1)(B). Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), Defendant and the Government agreed to a 151-month sentence. ECF No. 106 ¶ 11. Defendant was sentenced on January 16, 2018 to 151 months in the Federal Bureau of Prisons ("BOP") and four years' supervised release. ECF Nos. 138, 139. Defendant is currently projected to be released on June 23, 2026. ECF No. 184 at 1.

1

**LEGAL STANDARD**

"A court may not modify a term of imprisonment once it has been imposed except pursuant to statute." *United States v. Gotti*, 433 F. Supp. 3d 613, 614 (S.D.N.Y. 2020). Courts may reduce previously imposed terms of imprisonment pursuant to 18 U.S.C. § 3582(c)(1)(A), often referred to as compassionate release. Defendants may bring motions under Section 3582(c)(1)(A) if they have satisfied a statutory exhaustion requirement.[1] *Id.* The Court may grant relief if it finds that (1) "extraordinary and compelling reasons warrant [the] reduction" and (2) the "reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Id.* The Court must also consider the sentencing factors set forth in Section 3553(a). *Id.* §§ 3553(a), 3582(c)(1)(A). In analyzing these elements and factors, "[d]istrict courts have broad discretion in deciding whether to grant or deny a motion for a sentence reduction." *United States v. Tagliaferri*, No. 13-CR-115, 2019 WL 6307494, at *3 (S.D.N.Y. Nov. 25, 2019). If the Court grants such a motion, it may reduce the defendant's term of imprisonment and may correspondingly impose a term of probation or supervised release, with or without conditions, provided that such a term does not exceed the unserved portion of the original term of imprisonment. 18 U.S.C. § 3582(c)(1)(A).

**DISCUSSION**

In this case, even if Defendant could establish that extraordinary and compelling reasons warrant a reduction and it would be consistent with the applicable Sentencing Commission policy statement, a sentence reduction would not be warranted. Defendant has not presented evidence that causes the Court to reconsider its prior evaluations of the factors set forth in Section 3553(a).

---

[1] On April 15, 2020, Defendant moved to reduce his sentence because of COVID-19. ECF No. 176. On May 5, 2020, the Court denied Defendant's motion without prejudice because he had failed to satisfy the applicable statutory exhaustion requirement. ECF No. 181; *United States v. Montanez*, No. 15-CR-122, 2020 WL 2183093 (W.D.N.Y. May 5, 2020). The Government does not dispute that Defendant has now satisfied the statutory exhaustion requirement. ECF No. 186 at 2.

Under Section 3553(a), a court must consider the following factors when it imposes a sentence:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range [provided for by Sentencing Commission guidelines and policy statements];
> (5) any pertinent [Sentencing Commission policy statement];
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

The Court weighed these factors when it imposed Defendant's original term of imprisonment on January 16, 2018. ECF Nos. 138, 139. Accordingly, the Court's task here is not to "second guess or to reconsider whether" his current sentence is just, but to assess whether "the defendant's circumstances are so changed . . . that it would be inequitable to continue the confinement of the prisoner." *United States v. Ebbers*, 432 F. Supp. 3d 421, 429–30 (S.D.N.Y. 2020) (internal quotation marks omitted) (discussing legislative history of Section 3582). In other words, the issue is whether the original Section 3553 factors "outweigh the 'extraordinary and compelling reasons' warranting compassionate release," and, in particular, "whether compassionate release would undermine the goals of the original sentence." *Id.* at 430–31.

Here, Defendant's primary basis for compassionate release is his claim that he is particularly susceptible to COVID-19 and he faces a greater risk of contracting the disease while incarcerated. ECF Nos. 182, 188. The Court's task is to determine what weight, if any, to give these considerations[2] in evaluating whether they outweigh the Section 3553 factors supporting Defendant's sentence. *Ebbers*, 432 F. Supp. 3d at 429–31. Such an inquiry requires the Court to evaluate two questions: (1) to what degree, if at all, do Defendant's medical conditions increase his risk of COVID-19 infection or complications; and (2) to what degree, if at all, are Defendant's chances of contracting COVID-19 increased while incarcerated compared to if he were released? Perhaps unsurprisingly given the ubiquitous uncertainty associated with COVID-19, the record does not permit the Court to definitively answer either question.

Defendant claims that he suffers from various ailments, including asthma, hypertension, and heart disease, that increase his risk of complications due to COVID-19. ECF No. 182 at 2; ECF No. 182-4 (letter from Defendant's mother detailing his health conditions); ECF No. 188 at 1.[3] Defendant is forty-two, and his presentence investigation report notes that he suffers from asthma and hypertension. ECF No. 128 ¶¶ 96–99; ECF No. 184 at 2. Defendant's medical records show a history of hypertension, asthma, and testing for heart-related issues.[4] ECF No. 189 at 2, 12–14, 24–26. In an action pending in the Northern District of Ohio, Defendant was identified as

---

[2] The Court may take the Defendant's medical condition into account at sentencing and consider potential consequences of the types of sentences available. *See* 18 U.S.C. § 3553(a)(1), (a)(3).

[3] Defendant also claims, without support, that his health conditions increase his risk of contracting COVID-19. ECF No. 182 at 2, 18; ECF No. 188 at 1. Even assuming Defendant had supported this proposition with some evidence, the result here would not change.

[4] An echocardiogram revealed "dilation of the left atrium," "evidence of left ventricular hypertrophy," "some trace mitral regurgitation," and "some trace tricuspid regurgitation," ECF No. 189 at 25, but Defendant does not present evidence that allows the Court to discern the severity of these conditions and there is no evidence the echocardiogram, which took place in early 2019, resulted in a new course of treatment for Defendant, suggesting that these conditions might not be particularly serious.

a member of a subclass of inmates incarcerated at FCI Elkton who are at higher risk of complications according to Centers for Disease Control and Prevention ("CDC") guidelines because they are either older than sixty-five or afflicted by certain preexisting medical conditions. ECF No. 182 at 19–20; ECF No. 182-2 at 5; 182-3 at 1.[5]

The Government argues that the record does not disclose the degree of increased risk Defendant faces because of his preexisting conditions. ECF No. 186 at 3. The Government further points out that the CDC notes that asthma that is moderate to severe (as opposed to less severe varieties) may increase an individual's risk of COVID-19 complications but that the severity of Defendant's asthma is unclear. *Id.* The Government also notes the CDC's position that hypertension, standing alone, may not be sufficient to increase an individual's risk. *Id.* at 4. Defendant's medical records do not reveal the severity of his various conditions but it appears Defendant's course of treatment was conservative. ECF No. 189 at 2, 12–14, 24–26.

The Court is left with an incomplete record that provides some evidence that Defendant faces a greater than average risk of suffering adverse consequences if he contracts COVID-19 given his preexisting conditions. But it is unclear that the degree of the increased risk he faces is significant. For purposes of his motion, however, the Court accepts that Defendant faces some increased risk of COVID-19 complications.

---

[5] The Northern District of Ohio initially ordered Defendant, as a subclass member, and other inmates to be moved out of FCI Elkton. *Wilson v. Williams*, No. 20-CV-794, 2020 WL 1940882 (N.D. Ohio Apr. 22, 2020); *Wilson v. Williams*, No. 20-CV-794, 2020 WL 2542131 (N.D. Ohio May 19, 2020); *see also* ECF No. 186 at 3 (noting that the BOP was prepared to transfer 800 subclass members out of FCI Elkton in compliance with the Northern District of Ohio's order). That order, however, was vacated by the Sixth Circuit. *Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020). The Sixth Circuit found that "[t]he BOP has . . . put in place and updated its protocols to address the novel risks from COVID-19. The BOP's steps to prevent and mitigate COVID-19 spread at Elkton are likely reasonable responses to this serious risk." *Id.* at 844.

With respect to the second question, Defendant is currently incarcerated in Ohio at FCI Elkton, a low-security correctional institution that houses 2,196 inmates, including 369 in an adjacent low-security satellite prison. ECF No. 182 at 2; *FCI Elkton*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/elk/ (last visited July 23, 2020). FCI Elkton has been particularly hard hit by COVID-19. *See* ECF No. 186 at 3 (the Government admits "FCI Elkton has a great number of COVID-19 cases"). Currently, the BOP reports that 164 FCI Elkton inmates are infected with COVID-19, two staff members are infected, nine inmates have died from COVID-19, 841 inmates have recovered from COVID-19 infection, and fifty-one staff members have recovered. *COVID-19 Coronavirus*, FEDERAL BUREAU OF PRISONS, http://www.bop.gov/coronavirus/ (last visited July 23, 2020). Earlier in the COVID-19 crisis, the Attorney General specifically identified FCI Elkton as a facility facing "significant levels of infection" and directed the BOP to increase the use of home confinement for prisoners housed at FCI Elkton and other similarly situated facilities. ECF No. 178-1 at Ex. B.

The Government argues that the BOP is taking steps at FCI Elkton to protect inmates, such as suspending visitation (including attorney visits), suspending unnecessary inmate movement, providing additional training, and screening staff and inmates. ECF No. 186 at 3. Although the number of infected inmates at FCI Elkton and the death toll are both far too high, there is some evidence that the measures imposed by the BOP have limited further spread of the virus. The nine inmates who tragically lost their lives due to COVID-19 all passed before early May. As of June 9, 2020, the BOP reported that there were 286 infected FCI Elkton inmates; ECF No. 182 at 5; ECF No. 188 at 5, since then, the number of active COVID-19 cases among the FCI Elkton inmate population has decreased. *See United States v. Tranter*, No. 17-CR-22, 2020 WL 3841268, at *4 (N.D. Ind. July 8, 2020) (acknowledging that the serious COVID-19 outbreak at FCI Elkton

6

persists but noting that the facility has made progress in "fighting the virus"); ECF No. 184 at 2 (noting that doctors are available at FCI Elkton each day to address health concerns and that symptomatic inmates are quarantined).

Defendant claims that he does not have access to soap or sanitizer and that testing is limited at FCI Elkton (and thus the true scope of the crisis is underreported). ECF No. 182 at 5, 9. Defendant further argues that incarcerated individuals are generally less able to protect themselves from COVID-19 and that BOP facilities are "uniquely hospitable" to the spread of COVID-19. *Id.* at 8–9. Defendant cites to data suggesting that, in May 2020, the percent of the BOP's inmate population infected with COVID-19 was greater than the percent of the total U.S. population infected with the virus. *Id.* at 10. Accordingly, Defendant claims that, if he were removed from FCI Elkton and confined to his home, his chances of contracting COVID-19 would be "greatly reduced." *Id.* at 16. If Defendant were released, he would live with his significant other, a Registered Medical Assistant, in Jamestown, New York. *Id.* at 17; ECF Nos. 182-4, 188-1.

The Probation Department reports that the BOP is testing inmates at FCI Elkton "when necessary." ECF No. 184 at 2. As of early May, FCI Elkton reported that it had two COVID-19 testing machines, that it was testing certain asymptomatic inmates, and that it was coordinating with an outside laboratory to complete mass testing (pending approval). ECF No. 182-3 at 5. The record provides little information on the exact nature of the testing currently occurring at FCI Elkton or that has occurred since May, but it appears that, as of July 21, 2020, mass testing had occurred at the facility and a total of 6,589 COVID-19 tests had been performed, including 100 on that day alone. *Wilson v. Williams*, No. 20-CV-794, *Respondents' Status Report*, Dkt. No. 158 (N.D. Ohio); *see also COVID-19 Coronavirus*, FEDERAL BUREAU OF PRISONS,

http://www.bop.gov/coronavirus/ (last visited July 23, 2020) (reporting that 2,198 inmates have been tested at FCI Elkton).

Given the severe outbreak at FCI Elkton, Defendant has shown that he faces a greater risk of contracting COVID-19 while incarcerated than if he were released. There is some evidence, however, that the degree of that risk may not be as great as Defendant suggests. This is particularly true given that Defendant intends to live with his significant other, who is a Registered Medical Assistant and is accordingly more likely to be exposed to COVID-19. Release would not absolve Defendant of the risk of infection. *See United States v. Veras*, No. 19-CR-10, 2020 WL 1675975, at *4 (M.D. Pa. Apr. 6, 2020) ("[T]he potential for exposure exists anywhere in the community, not just in jail . . . ."). For purposes of his motion, however, the Court accepts that Defendant faces increased risk of infection while incarcerated at FCI Elkton.

Even accepting that Defendant faces increased risk of infection and some risk of COVID-19 related complications, these considerations do not outweigh the Section 3553(a) sentencing factors that support maintaining his sentence. *See United States v. Weiskopf*, No. 19-CR-6093, 2020 WL 4013188, at *2–4 (W.D.N.Y. May 15, 2020) (denying compassionate release to defendant incarcerated at FCI Elkton who faced risk of complications where actual likelihood of complications was not established and the risk shown by defendant did not outweigh the Section 3553(a) factors supporting his sentence). COVID-19 does not "warrant the release of every federal prisoner with health conditions that make them more susceptible to the disease." *United States v. Gold*, No. 15-CR-330, 2020 WL 2197839, at *1 (N.D. Ill. May 6, 2020) (internal quotation marks omitted); *see also United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release."); *cf. United States v. Seshan*, No. 14-CR-620, 2020

WL 2215458, at *4 (S.D.N.Y. May 6, 2020) (collecting cases in which courts denied compassionate release to inmates with serious medical conditions).

In further support of his motion, Defendant claims that he is classified as a low security level and has had only one recent disciplinary issue, which is currently pending and relates to possession of an allegedly contraband adult magazine. ECF No. 182 at 15. Defendant also claims he has completed and continues to participate in rehabilitative programing, including a drug program and work towards earning his GED. ECF No. 182 at 16. The Court commends Defendant for completing rehabilitative programming. Defendant's efforts weigh in his favor.

Any considerations weighing in Defendant's favor, however, are outweighed by the factors that supported and continue to support Defendant's sentence. *See Seshan*, 2020 WL 2215458, at *4. As he concedes, Defendant's initial offense was serious—Defendant participated in an expansive drug distribution conspiracy by supplying a network of dealers with more than a kilogram of heroin. ECF No. 128 ¶¶ 7–44; ECF No. 182 at 15; ECF No. 186 at 5. Further, Defendant has an extensive criminal history. Defendant was convicted of: a disorderly conduct violation for possessing a bag of crack cocaine and a marijuana blunt in 1994; a harassment violation for striking another individual and struggling with officers when he was placed under arrest in 1997; a misdemeanor for possessing heroin packaged for sale within 1,000 feet of a school in 2001; a felony for selling a controlled substance in 2006; and a felony for a conspiracy to possess with intent to distribute, and to distribute, cocaine in 2012. ECF No. 128 ¶¶ 62–67. Defendant also has a history of failing to comply with conditions of release: in relation to his 2001 conviction, Defendant failed to complete required substance abuse treatment and continued using illegal substances while on pretrial release and, once released on probation, failed to report as directed, failed to complete substance abuse treatment, failed to complete a GED program, failed to pay

court-ordered fines, and failed to inform his probation officer of a move; and in relation to his 2012 conviction, Defendant tested positive for illicit substances and failed to complete required outpatient treatment while on supervised release, which resulted in the court revoking his supervised release. *Id.* ¶¶ 64, 67. While on parole for his 2006 conviction, Defendant exhibited some signs of improved adjustment but was ultimately re-arrested on charges that were later dismissed. *Id.* ¶¶ 65–66.

Defendant's guideline imprisonment range was 188 months to 235 months. *Id.* ¶ 76. The Court departed from the guideline range in Defendant's favor and sentenced him to the 151-months' imprisonment agreed to by the Defendant and the Government. *Id.* ¶ 78; ECF No. 138. With a projected release date of June 23, 2026, Defendant has a significant amount of time remaining on his agreed-upon sentence. Given the serious nature of his offenses, such a drastic reduction in Defendant's sentence, which is already significantly lower than the low-end of the guideline range, would undermine the need for his sentence "to reflect the seriousness of the offense, to promote respect for the law, . . . to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(1), (2)(A)–(B), (6); *see also United States v. Mack*, No. 16-CR-112, 2020 WL 4012837, at *2 (N.D. Ohio July 16, 2020) (holding that Section 3553(a) factors did not favor release of defendant who was "high-risk" for COVID-19-related complications and "held in a prison experiencing a severe COVID-19 outbreak" (FCI Elkton) because defendant had more than a year remaining on his sentence).[6]

---

[6] Defendant claims, without authority, that the Court could mitigate these concerns by modifying his sentence to require that he serve the remainder of it in home confinement. ECF No. 182 at 16. "The Court has no authority to direct the [BOP] to place a defendant in home confinement." *United States v. Cazares-Salazar*, No. 11-CR-685, 2020 WL 4048666, at *4 (S.D.N.Y. July 20, 2020). But the Court assumes,

Because of the substantial time remaining on Defendant's sentence, his serious offenses, his criminal history, and his prior violations of release conditions, the cases cited by Defendant where courts have granted compassionate release are distinguishable. *See, e.g.*, *United States v. Bess*, No. 16-CR-156, 2020 WL 1940809, at *11 (W.D.N.Y. Apr. 22, 2020) (granting compassionate release "[i]n light of the defendant's age, his serious health issues, the fact that his reoffending is unlikely, and the fact that he will remain under supervision for five years after his release").

The Court recognizes that the situation Defendant finds himself in is of serious concern: as an inmate, he has far less control over his environment and is far more reliant on correctional officials to ensure his safety during the pandemic. "A just punishment should not include an unacceptable risk of exposure to COVID-19 or any potentially lethal disease." *United States v. Vence-Small*, No. 18-CR-31, 2020 WL 2214226, at *4 (D. Conn. May 7, 2020). But neither should the uncertainty engendered by the present crisis be allowed to distort or subvert a just punishment. Defendant has not demonstrated that a reduction in his sentence is appropriate.

---

without deciding, that it could order home confinement-like conditions for Defendant's release. *See* 18 U.S.C. § 3582(c)(1)(A) (allowing courts to "impose a term of . . . supervised release with . . . conditions that does not exceed the unserved portion of the original term of imprisonment"); *see also United States v. Brooks*, No. 07-CR-20047, 2020 WL 2509107, at *6 (C.D. Ill. May 15, 2020) (granting compassionate release and imposing "home confinement" as a condition of release). Confining Defendant to his home for six years, however, outside of the strictures of an institutional environment, would fundamentally alter his sentence in a manner that is inconsistent with the Section 3553(a) factors, particularly considering Defendant's less-than-stellar compliance with prior conditions of release. *See* 18 U.S.C. § 3553(a)(1), (2)(D) (requiring the Court to consider Defendant's individual characteristics and "the need for the sentence imposed . . . to provide the defendant with needed educational or vocational training, . . . or other correctional treatment in the most effective manner").

## CONCLUSION

For the foregoing reasons, Defendant's Renewed Motion to Reduce Sentence, ECF No. 182, is DENIED.

IT IS SO ORDERED.

Dated: July 23, 2020
      Rochester, New York

                                                  _____
                                                  HON. FRANK P. GERACI, JR.
                                                          Chief Judge
                                                  United States District Court